Mark T. KNOWLTON, et al.,
Plaintiffs, Appellees,

v.

DESERET MEDICAL, INC.,
Defendant, Appellant.

No. 89–2139.

United States Court of Appeals,
First Circuit.

Heard March 5, 1991.

Decided April 19, 1991.

Rehearing and Rehearing En Banc
Denied May 17, 1991.

Jeffrey S. Stern with whom Tina M. Traficanti, Ellen K. Wade and Sugarman, Rogers, Barshak & Cohen were on brief, Boston, Mass., for defendant-appellant.

Terrence D. Garmey with whom Smith & Elliott were on brief, Saco, Me., for plaintiffs-appellees.

Before CYR, Circuit Judge, COFFIN and BOWNES, Senior Circuit Judges.

BOWNES, Senior Circuit Judge.

The main issue on this appeal requires us to determine under Massachusetts law the duty to warn imposed on the manufacturer-seller of medical devices used during open-heart surgery and the closely related question of causation. Plaintiffs-appellees Mark Knowlton and his mother, Bonnie B. Tetrault, brought suit for injuries from chemical burns incurred by Knowlton during open-heart surgery at Children's Hospital in Boston. The jury found that defendant-appellant Deseret Medical, Inc. was liable for failing to adequately warn the surgeon-user of the danger involved in the manner in which the surgeon used the devices.

## I. BACKGROUND

The purpose of the surgery was the insertion of two artificial heart valves to replace the natural valves which had been damaged by disease. Part of the surgical procedure required placing catheters, small hollow flexible tubes, directly into the left and right atria of the heart.[1] The catheters are called atrial lines. This case concerns only the right atrial line, which was used to carry a drug Nitroprusside (Nipride) into the right atrium during the immediate post-operative period. In order for the catheter to infuse the drug into the heart, it had to be attached to the container holding the solution of Nipride. The focus of this case is the method used by the surgeon to ensure that the Nipride solution flowed from its container through the catheter tubing into the right atrium of the patient's heart.

---

1. The atria are cavities in the heart from which the blood passes to the ventricles. Dorlands' Illustrated Medical Dictionary 163 (25th ed. 1974).

One end of the catheter was inserted directly into the right atrium by the surgeon during the open-heart part of the operation. A hollow needle with sharp beveled edges near the point was inserted through the chest wall. When the surgeon was able to see the point of the needle in the chest cavity, he inserted the other end of the catheter into the point of the needle and threaded it into the needle from the point to the hub. This is called retrograde threading. The needle and catheter were then pulled back through the chest wall. The catheter was then cut and tied so that enough protruded from the chest wall to allow it to be attached to another tube leading to the container of Nipride solution.

On the day following the surgery, a nurse noticed that the gauze on the patient's chest dressing was wet. She called the attending physician, Dr. Richard Jonas, who removed the catheter, found a small hole in it and discarded it. Dr. Jonas was not a member of the operating team. It was subsequently determined that Nipride had leaked from the catheter onto the chest and abdominal walls of the patient causing extensive and intensive chemical burns. There was significant scarring and substantial plastic surgery was required. At the time of the open-heart surgery, the plaintiff Mark Knowlton was fifteen years old.

The plaintiffs sued Deseret Medical, Inc., the manufacturer-seller of the catheter and needle used during the open-heart surgery. They alleged: (1) breach of warranty and negligence in the design of the catheter and needle; (2) breach of warranty and negligence in the manufacture of the catheter and needle; and (3) breach of warranty and negligence in failing to give an adequate warning of the danger involved in the use of the catheter and needle. Under Massachusetts law, a count for breach of warranty is "intended to be fully as comprehensive as the strict liability theory of recovery that has been adopted by a great many other jurisdictions." *Back v. Wickes Corp.*, 375 Mass. 633, 378 N.E.2d 964, 968 (1978).

The plaintiffs also brought medical malpractice claims against Dr. William Norwood, the chief surgeon during the operation, and two other doctors involved in the open-heart surgery, Dr. Robert Emery and Dr. William Parks. Dr. Richard Jonas was also sued. Malpractice claims were also brought against Children's Hospital and three nurses. Prior to trial, the claims against Dr. Jonas, Children's Hospital and the three nurses were dropped.

The case was tried to a jury over a period of four and one-half weeks with Magistrate Robert B. Collings presiding by agreement of counsel. Thirty interrogatories were submitted to the jury. After eight days of deliberation, the jury returned the following verdicts. It found Dr. Emery and Dr. Parks not liable. There were two separate claims of medical malpractice against the chief surgeon, Dr. Norwood. The jury found that Dr. Norwood was not negligent in the manner in which he inserted the catheter into the right atrium and withdrew it through the chest wall during the open-heart surgery. The jury did find that Dr. Norwood was negligent in suturing the implant valves into Mark's heart. The jury awarded $20,000 in damages to the plaintiff-patient and $32,337.03 to his mother against Dr. Norwood, who is not an appellant in this case.

The jury made the following findings as to the liability of Deseret. It found that Deseret was neither negligent nor liable for breach of warranty in the design of the catheter and needle. The jury found that Deseret had not breached its warranty in respect to the manufacture of the catheter and needle. It found that Deseret was negligent in the manufacture of the devices but that this negligence was not a proximate cause of the injury. As to warning, however, the jury found liability. It found that Deseret breached its warranty because it failed to provide an adequate warning of the danger inherent in the use of the catheter and needle or properly instruct foreseeable users of the catheter and needle. It also found that Deseret was negligent in respect to warning and proper instruction. The jury further found that this breach of warranty and negligence were

proximate causes of the injury sustained by Mark Knowlton. It awarded him $337,500 in damages and his mother, $37,455.06.

Deseret has appealed from the denial of its motion for judgment n.o.v. or, in the alternative, for a new trial. In addition to the warning-causation issue, Deseret assigns two other errors to the trial court: refusal to instruct the jury that expert testimony on failure to warn was required; and an evidentiary ruling excluding certain testimony by Dr. Norwood.

## II. WARNING–CAUSATION

The standard for reviewing the denial of a motion for judgment n.o.v. has been stated as follows:

> When considering an appeal from the denial of motions for directed verdict and judgment n.o.v., this court must view all the evidence in the light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor. To overrule the denial of defendant's motions we must find that the facts and the inferences drawn from the facts can reasonably lead to only one conclusion.

*Payton v. Abbott Labs*, 780 F.2d 147, 156 (1st Cir.1985). *See also Santiago Hodge v. Parke Davis & Co.*, 909 F.2d 628, 634 (1st Cir.1990); *Venturelli v. Cincinnati, Inc.*, 850 F.2d 825, 833 (1st Cir.1988).

The first question is whether the evidence was sufficient for the jury finding that defendant failed to warn or instruct adequately foreseeable users of its catheters and needles.

Defendant manufactured and sold to hospitals and doctors a catheter placement unit known as Intracath, which had the following component parts: tubing (also called the catheter), a needle with sharp beveled edges leading to the point, a needle guard, a flow control plug in the needle hub, a wire eyelet and a bevel cover. The directions for use were printed on a rolled-up sheet of paper that was inserted into the package containing the Intracath. The directions on the insert make it clear that the primary use of the Intracath was for venipunctures: the insertion of the needle and catheter tubing into a vein. There is no mention or suggestion in the directions that the catheter could also be used for insertion into the atrium of the heart during open-heart surgery and that the needle could be used to withdraw the catheter through the chest wall, as was done in this case. The only warning given in the insert stated: "CAUTION: If catheter placement is not successful, pull out needle and catheter together. DO NOT pull out catheter first as sharp bevel edge of needle may cut catheter as it is being withdrawn."

There was testimony, however, from which it could be found that Jacqueline Fraley, manager, Quality Assurance Professional Services of Deseret, knew that catheters and needles from the Intracath unit were used as atrial lines during open-heart surgery. Glen Kazanowski, a field representative and salesman for Deseret, testified that he learned that the Intracath was being used in open-heart surgery at Massachusetts General Hospital. Deseret's manager of catheter products, Brad Bell, disclaimed any knowledge of such use, but he and the two other employees acknowledged that retrograde threading of the catheter through the needle point to the hub posed a significant risk that the catheter tube might be cut or nicked in the process. Dr. David Lentz, vice-president in charge of research and development for Deseret's medical products, was aware that catheters had been nicked or shredded due to "retrograde passage." He acknowledged that retrograde threading of the catheter into the needle posed a danger of damaging the catheter. Dr. Lentz further testified that Deseret took no steps to warn surgeons that retrograde threading should not be done.

There was evidence that the procedure followed by Dr. Norwood at Children's Hospital was also used at Massachusetts General Hospital, Brigham & Women's Hospital and the hospitals at the Universities of Michigan and Iowa.

■ The theory of implied warranty under Massachusetts law is "congruent in nearly all respects with the principles expressed in Restatement (Second) of Torts

§ 402 A (1965)." *Back v. Wickes Corp.,* 378 N.E.2d at 969. *See also Correia v. Firestone Tire & Rubber Co.,* 388 Mass. 342, 446 N.E.2d 1033, 1039 (1983). The first sentence of Comment j to § 402A states: *"Directions or warning.* In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use." (Emphasis original). *Comment h* states in pertinent part: "Where [the seller] has reason to anticipate that danger may result from a particular use, as where a drug is sold which is safe only in limited doses, he may be required to give adequate warning of the danger (see Comment j), and a product sold without such warning is in a defective condition."

■ In *Slate v. Bethlehem Steel Corp.,* 400 Mass. 378, 510 N.E.2d 249, 251 (1987), the court reiterated the principle that a manufacturer of a product which it knew or should know is dangerous by nature or is in a dangerous condition has a duty to warn of the dangers. Under Massachusetts law, "[t]he implied warranty of fitness includes uses which are reasonably foreseeable but does not include unforeseeable misuses of a product." *Allen v. Chance Mfg. Co., Inc.,* 398 Mass. 32, 494 N.E.2d 1324, 1326 (1986). In a case involving oral contraceptives, *MacDonald v. Ortho Pharmaceutical Corp.,* 394 Mass. 131, 475 N.E.2d 65, 71 *cert. denied,* 474 U.S. 920, 106 S.Ct. 250, 88 L.Ed.2d 258 (1985), the court quoted with approval the Supreme Court of Ohio in *Seley v. G.D. Searle & Co.,* 67 Ohio St.2d 192, 423 N.E.2d 831, 837 (1981): "A reasonable warning not only conveys a fair indication of the nature of the dangers involved but also warns with the degree of intensity demanded by the nature of the risk." In *Hayes v. Ariens Co.,* 391 Mass. 407, 462 N.E.2d 273 (1984), the court held:

> For strict liability purposes, and therefore for purposes of our warranty law,

the adequacy of a warning is measured by the warning that would be given at the time of sale by an ordinarily prudent vendor *who, at that time, is fully aware of the risks presented by the product.* A defendant vendor is held to that standard regardless of the knowledge of risks that he actually had or reasonably should have had when the sale took place. The vendor is presumed to have been fully informed at the time of the sale of all risks.

*Id.* 462 N.E.2d at 277 (emphasis original). The adequacy of the warning is for the jury. *Laaperi v. Sears, Roebuck & Co., Inc.,* 787 F.2d 726, 731–732 (1st Cir.1986); *MacDonald v. Ortho Pharmaceutical Corp.,* 475 N.E.2d at 71.

Defendant argues that the warning given was adequate because a sophisticated user of the catheter and needle, such as Dr. Norwood, would realize that the same danger of cutting the catheter on the sharp bevel edge of the needle is presented in retrograde threading as in pulling the catheter and needle out of a vein.[2] The governing legal principle is not in dispute. " 'It is clear that there should be no liability for failing to warn someone of a risk or hazard which he appreciated to the same extent as a warning would have provided.' " *Slate v. Bethlehem Steel Corp.,* 400 Mass. 378, 510 N.E.2d 249, 252 (1987) (quoting W. Prosser & W. Keeton, Torts § 96 at 686 (5th ed. 1984)).

Before we can determine whether Dr. Norwood, as a reasonably prudent heart surgeon, appreciated the hazard involved in retrograde threading, we must first determine what kind of warning the jury impliedly found was required. This can be determined from the jury's answers to the verdict questions and the evidence.

■ At the outset of this inquiry we reject defendant's claim that it was error for the district court to refuse to instruct

---

**2.** It is generally accepted that in a case involving medical products prescribed or used by a physician or trained medical personnel, the warning runs to the physician not the patient. *See MacDonald v. Ortho Pharmaceutical Corp.,* 394 Mass. 131, 475 N.E.2d 65, 69 (1985) (prescrip-

tion drugs); *Kirsch v. Picker Intern., Inc.,* 753 F.2d 670, 671 (8th Cir.1985) (x-ray machine); *Phelps v. Sherwood Medical Indus.,* 836 F.2d 296, 300–303 (7th Cir.1987) (catheter used in heart implant).

the jury that expert testimony on failure to warn was necessary. Such an instruction would have been superfluous. All of the liability evidence was by physicians, trained medical personnel and employees of Deseret. The jury did not need the help of an expert to explain or formulate a warning. As will be developed in detail below, it had before it all the evidence needed to determine what warning should have been given.

█ The jury's answers to the verdict questions can only mean that it found the catheter was undamaged at the time one end of it was inserted into the right atrium prior to the start of the retrograde threading. The jury found there was no design defect in the catheter and that, although the catheter and needle were negligently manufactured, this was not a cause of the injuries.

The evidence not only pointed to catheter damage during the retrograde threading, it effectively excluded other causes. Dr. Robert McIntyre, an open-heart surgeon of considerable experience, testified on behalf of plaintiffs. Although not allowed to give his opinion as to the cause of the hole in the catheter, he testified that no other surgical instrument, except the needle, was in close proximity to the catheter during the operation. This testimony went uncontroverted. Dr. McIntyre also testified that the retrograde threading procedure used by Dr. Norwood was not safe because the catheter could be damaged by the shear point of the needle. Professor Rose, a metallurgist, conducted, along with Dr. McIntyre, a number of experiments of retrograde threading using catheters and needles of the same type that was used during the operation. A piece of beefsteak of approximately the same thickness as the chest wall was used to simulate the withdrawal of the needle and catheter through the chest wall. It was Professor Rose's

opinion, "that the hole in the catheter was most probably caused by the damage caused by the retrograde insertion procedure." He gave three grounds for his opinion: the catheter can be easily damaged during retrograde threading; the catheters that he used in the experiments were free from defects, and because of the quality control procedures used by Deseret, "manufacturing defects in a catheter are not very probable"; and there were no other sharp instruments in the vicinity of the catheter except the needle. Rose emphasized that the damage to a catheter resulting in a hole "can be so slight as to be invisible."

Based on this testimony the jury could have found that an explicit warning against the danger of nicking or cutting the catheter during retrograde threading should have been given. There was also testimony from which the jury could have found that physicians should have been advised not to do any retrograde threading at all with this needle and catheter. Deseret's manager of catheter products, Brad Bell, testified that it would be a misuse of the product to thread the catheter through the needle retrograde because it increases the chances that the bevel edge of the needle will cut the catheter.

█ We now address the question whether a reasonably prudent heart surgeon[3] who used the retrograde threading technique appreciated its hazard sufficiently so that a warning would not be necessary. Defendant argues that it is obvious from the procedure followed by Dr. Norwood and others that the danger of damaging the catheter during retrograde threading was appreciated because two precautions were taken. The first was that the catheter was threaded with great care. In the words of Dr. Emery, there was "careful attention to detail." Dr. Norwood explained that the point of the needle was

---

**3.** In its instructions, the trial court used the phrase "average physician or medical care provider who uses the catheter placement unit." There was no objection. Although there is no Massachusetts case directly on point, we think it beyond cavil that the target of warnings is the objective reasonable (or average) user. *See*

*Hermes v. Pfizer, Inc.,* 848 F.2d 66, 69 (5th Cir. 1988) (reasonably prudent physician). *Guevara v. Dorsey Laboratories Div. of Sandoz,* 845 F.2d 364, 367 (1st Cir.1988) (drug manufacturer's duty to warn runs to general practitioner as well as unusually sophisticated medical man).

fully visible during the threading process. The second precaution was taken after the catheter and needle were withdrawn through the chest wall. At that point, the section of the catheter that had been threaded into the needle was cut off and discarded. Thus, the section of the catheter that could have been damaged during the retrograde threading was not used.

The precautionary steps, however, were attacked by plaintiffs' experts, Dr. McIntyre and Professor Rose, as being far from foolproof. Professor Rose testified that, because of the material of which the catheter was made, a nick or cut so small as to be invisible to the naked eye would result in a hole large enough to allow fluid to leak out of the catheter. Both Dr. McIntyre and Professor Rose testified that, on the basis of their experiments, there would be sufficient "slippage" of the catheter to allow a damaged section to be used during the infusion of the Nipride into the heart.

Dr. McIntyre described two alternatives to the procedure followed by Dr. Norwood. One was to push the needle through the chest wall, thread the catheter into the needle from the hub to the point and then insert the catheter into the atrium. This would eliminate the danger of retrograde threading. Dr. McIntyre also testified that the danger of damage to the catheter in retrograde threading could be eliminated by:

> instead of using a sharp needle, use the Rakac type needle that has a blunt end so that [sic] the needle is passed retrograde there is nothing that can damage the catheter. [sic] The catheter is passed retrograde through such a blunt needle and there is nothing that can injure the catheter.

Dr. McIntyre testified that the procedure followed by Dr. Norwood was neither safe nor reasonable. There was evidence, as already noted, that retrograde threading was standard procedure at three hospitals in New England: Children's, Massachusetts General and Brigham & Women's. Dr. Norwood testified that the method he used was safe, effective and good acceptable surgery and that he continues to follow the same procedure. He further stated that he had never experienced catheter leakages prior to this time.

Viewing the evidence in the light most favorable to the plaintiffs, we find there was evidence sufficient for a finding that the reasonably prudent heart surgeon using the procedure followed by Dr. Norwood would not have appreciated the danger inherent in retrograde threading. There was evidence that a cut or nick in the catheter sufficient to cause a hole would be invisible to the naked eye, and therefore not seen by the surgeon. There was evidence from which it could be reasonably inferred that the precaution of cutting off the section of the catheter that had been threaded retrograde into the needle did not take into account that slippage of the catheter could occur and if it did, a damaged portion of the catheter might inadvertently be used. Based on the testimony of Doctors Norwood, Jonas and Emery, it could be found that such slippage was not appreciated by surgeons using the retrograde threading procedure. It could be found that the use of this procedure in a number of hospitals would blind the reasonably prudent surgeon to the ever-present danger inherent in retrograde threading. The jury, therefore, had a firm evidentiary footing for its implied finding that an adequate warning of the danger inherent in retrograde threading was necessary.

■ We think that the questions of the adequacy and negligence of the warning were properly submitted to the jury. The warning given in the insert was limited to advising that, if the catheter placement was not successful, the catheter and needle should be pulled out together because if the catheter was pulled out first, it might be cut on the sharp bevel edge of the needle. There was no direct warning about the danger of retrograde threading of the catheter into the needle. The jury could reasonably have found that Deseret knew or should have known that its catheter and needle were widely used in open-heart surgery, that such use involved the retrograde threading of the catheter into the needle, that this posed a danger that the catheter

would be damaged so that the fluid it was carrying could leak from the catheter onto the skin and exposed body parts of the patient and that the reasonably prudent heart surgeon would not have appreciated the danger inherent in retrograde threading.

■ Deseret's last line of defense is that even if an adequate warning had been given, plaintiffs did not prove that Dr. Norwood would have followed it. Defendant argues that Dr. Norwood should have been asked by plaintiffs if he would have followed a warning stressing the danger of retrograde threading.

This, however, is a misdirected line of fire. The presumption is generally accepted in most jurisdictions, including Massachusetts, that if a warning is given, it will be followed. It is difficult to accept that a proper warning would have been deliberately ignored. To do so would amount to malpractice, as the trial court pointed out in its opinion denying defendant's motion for a judgment n.o.v.

The last paragraph of Comment j of the Restatement states: "Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous." In *Harlow v. Chin*, 405 Mass. 697, 545 N.E.2d 602, 606 (1989), the Supreme Judicial Court stated: "The law permits an inference that a warning, once given, would have been followed." It cited to *Wolfe v. Ford Motor Co.*, 6 Mass. App.Ct. 346, 376 N.E.2d 143, 147 (1978), which quoted Comment j of the Restatement. *See also Plummer v. Lederle Laboratories*, 819 F.2d 349, 356–57 (2d Cir.), *cert. denied*, 484 U.S. 898, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987); *Reyes v. Wyeth Laboratories*, 498 F.2d 1264, 1281 (5th Cir.), *cert. denied*, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974).

The clearest explanation we have found of how the presumption works is in an Ohio case which the Massachusetts Supreme Judicial Court followed, *supra* at 120, as to what constitutes a reasonable warning. In *Seley v. G.D. Searle & Co.*, 423 N.E.2d at 838, the Ohio Supreme Court explained:

Comment j to Section 402 A (2 Restatement of Torts 2d 353) establishes a presumption that an adequate warning, if given, will be read and heeded. In such a situation, the presumption established works to the benefit of the manufacturer. However, where no warning is given, or where an inadequate warning is given, a rebuttable presumption arises, beneficial to the plaintiff, that the failure to adequately warn was a proximate cause of the plaintiff's ingestion of the drug. This presumption, absent the production of rebutting evidence by the defendant, is sufficient to satisfy the first branch of the plaintiff's proximate cause burden.

Under this reasoning, which we find Massachusetts would accept, it was incumbent on the defendant, not plaintiff, to prove that Dr. Norwood would not have followed an adequate warning about the danger inherent in retrograde threading.[4] Deseret failed to do so to the extent necessary to entitle it to a judgment n.o.v.

## III. EXCLUSION OF TESTIMONY

The trial court excluded the following proffered testimony of Dr. Norwood as to what caused the hole in the catheter.

I have no certain knowledge as to what may have caused the hole.

I have a strong opinion that it was not related to the style of insertion of a particular catheter.

THE COURT: What's the basis for that opinion?

THE WITNESS: I suppose it's two-fold. One, the style of placement of that

---

**4.** We must acknowledge that this assessment of Massachusetts law is not in accord with our holding in *Vincent v. Louis Marx & Co.*, 874 F.2d 36 (1st Cir.1989). In *Vincent*, we held it was not error to fail to give an instruction that under Massachusetts law there was a presump-

tion that if an adequate warning had been given, it would have been read and followed. *Id.* at 42. *Vincent*, however, was decided on May 9, 1989, prior to the explicit recognition by Massachusetts of the presumption on October 19, 1989, in *Harlow v. Chin*, 545 N.E.2d at 606.

particular catheter is of such a nature that one of the central focuses is to avoid abnormalities of the catheter.

And two, a modest to large experience with this particular technique by myself and others where this is not a—that this particular catheter, the style of catheter placement is not damaging of the catheter in this way.

The court then ruled:

THE COURT: I think I'm going to reverse my ruling and sustain the objection for the same reason I sustained the objection with respect to the earlier testimony on this.

You certainly can bring out this never happened in his experience, that there's never been a hole, and you can certainly bring out that in his view, that anything that's placed through the needle is cut off so it couldn't have caused the hole.

But it seems to me that you're not using his expertise in bringing that opinion or it's not the type of testimony the jury needs an expert opinion on. They can draw their own inferences from these facts that he's going to testify to.

So I'll sustain the objection, but you can bring out the facts on which the jury can come to that conclusion.

Defendant argues that the doctor's opinion as to the cause of the hole should have been admitted for two reasons: it was admissible as expert opinion; and it was admissible to rebut Professor Rose's opinion that the hole in the catheter was most probably caused by the retrograde threading.

■ Our standard of review for the admission or exclusion of evidence is abuse of discretion. *Pittsley v. Warish*, 927 F.2d 3, 9–10 (1st Cir.1991); *United States v. Nivica*, 887 F.2d 1110, 1119 (1st Cir.), *cert. denied*, — U.S. ——, 110 S.Ct. 1300, 108 L.Ed.2d 477 (1989); *Freeman v. Package Machinery Co.*, 865 F.2d 1331, 1339 (1st Cir.1988). Although it is a close question, we find there was no abuse of discretion in excluding the testimony. As the court pointed out in its ruling, the opinion of Dr. McIntyre as to the cause of the hole was also excluded. The court felt that the testimony of Dr. McIntyre and Dr. Norwood gave the jury sufficient facts for it to determine itself the cause of the catheter hole. We agree. It was obvious from their testimony what the opinions of each doctor would be. The explicit statements that the hole was (Dr. McIntyre) or was not (Dr. Norwood) caused by retrograde threading did not add anything but an obvious conclusion to the testimony already in evidence.

■ Professor Rose's opinion stands on a different footing. He was a metallurgist familiar with the hardness and sharpness of the needle as well as the material of which the catheter was made. Rose conducted a number of experiments to determine if the catheter was likely to be nicked or cut during the procedure followed by Dr. Norwood. It was not error to admit Professor Rose's opinion as to the cause of the hole in the catheter.

We have considered carefully all of the finely-spun contentions of the defendant but find that neither individually nor in the aggregate do they form a basis for either a reversal or new trial.

Our review of the evidence in the light most favorable to the plaintiffs and our reading of Massachusetts law convinces us that liability and causation were proven. The verdict is therefore affirmed.

Costs awarded to appellees.