Debra A. JONES, f/k/a Debra A. De Fabrizio, Plaintiff,

v.

## WALTER KIDDE PORTABLE EQUIPMENT, INC., Defendant.

Civil Action No. 95–10175–GAO.

United States District Court, D. Massachusetts.

Aug. 12, 1998.

Clive D. Mtin, Alex H. MacDonald, Steven B. Rotman, Robinson & Cole, Boston, MA, for Plaintiff.

Peter L. Puciloski, Richard A. Sawin, Jr., Sugarman, Rogers, Barshak & Cohen, PC, Boston, MA, for Defendant.

### MEMORANDUM AND ORDER

O'TOOLE, District Judge.

The plaintiff experienced serious nerve damage to her right arm after surgery in which a pneumatic tourniquet manufactured and sold by the defendant was employed. She claimed that her injuries were caused by a malfunction of the tourniquet which caused it to apply higher pressure to her arm than the attending physicians intended. At trial, a jury determined that the defendant had not negligently designed the tourniquet and had not breached any implied warranty of fitness with respect to the tourniquet's design. However, the jury also concluded that the defendant had negligently failed to warn of dangers in the use of the tourniquet and had similarly breached its implied warranty by reason of its failure to warn of such dangers. The jury further found the defendant liable for breach of an express warranty. Separately, the Court concluded that the defendant had not committed an unfair trade act or practice in violation of Mass.Gen.L. ch. 93A, §§ 2, 9.

The defendant has moved for judgment in its favor as a matter of law under Fed. R.Civ.P. 50(b) and alternatively for a new trial under Fed.R.Civ.P. 59. After consideration of the parties' submissions, the Court determines that the defendant's motion ought to be granted.

*Failure to Warn*

The plaintiff's chief theory at trial was that the tourniquet in question had a design defect that made it unreasonably dangerous. In brief, the plaintiff's claim in this respect was as follows: A mechanical valve that controlled the input of pressure in the tourniquet was susceptible to developing a leak, so that even though the operator might set the dial for a particular pressure, a higher pressure might actually be delivered into the cuff. The tourniquet was designed to release excess pressure if it built up, but the plaintiff's expert testified that this design was inadequate for two reasons. First, the pressure would build to an unacceptably high level before the release would occur. This was a problem of "hysteresis," expected to some degree in any mechanical device, but present to an unacceptable degree in this one, according to the plaintiff's expert. Second, as the tourniquet was designed, it was possible for minute foreign particulate matter to clog or block the pressure release exhaust. If that were to occur when the regulating valve was leaking extra pressurizing gas into the tourniquet, the combination could produce a substantial increase of pressure in the cuff that would not be relieved as intended. Although there was a gauge that indicated the actual pressure in the tourniquet at any given time, and would accordingly show any unintended increase in pressure as it occurred, the tourniquet was nonetheless defective, according to the expert, because there was no audible or visible "alarm," other than the reading on the gauge itself, to call the operator's attention to the pressure increase. Moreover, the gauge itself was designed in a way that permitted it to go out of calibration and thus fail to yield an accurate reading of the pressure in the tourniquet. Thus, according to the plaintiff's expert, if the valve were to leak unwanted pressure into the tourniquet, and if the regulating exhaust were to be obstructed so that the increased pressure was not relieved, and if the gauge were to be out of calibration so that it gave

an inaccurate reading of the actual pressure, or, even if the gauge were working properly, if the operator's attention were not called to the gauge by an alarm, then injuriously high pressure could be applied to the patient's arm without the operating team knowing it.

That is what the plaintiff contended happened in this case. The parties stipulated that the surgical team, including the anesthesiologist who applied and monitored the tourniquet, behaved throughout in accordance with appropriate professional standards. In other words, they agreed that the plaintiff's injuries from the surgery were not caused by what the doctors did (or did not do). A neurologist who treated the plaintiff testified that her injuries must have been a result of a malfunction of the tourniquet, because the only other possible explanations could be ruled out.

The jury found, in answer to special questions, that the defendant did not negligently design the tourniquet and did not breach the implied warranty of merchantability with respect to the design of the tourniquet. Despite its rejection of the design defect claim, however, the jury found that the defendant had negligently failed to warn "of foreseeable and unreasonable risks in the tourniquet's design," and further that the defendant had breached the implied warranty in the same regard. The jury further found that the failure to warn caused the plaintiff's injuries.

The operating manual issued by the defendant for the tourniquet did contain some warnings about the use of the tourniquet. The jury apparently decided that these warnings were insufficient. If the jury did not accept the plaintiff's theory of defective design, what could it have been about the tourniquet or its operation that the jury thought called for a better warning?

The plaintiff's expert told the jury that the warnings in the manual were inadequate for several reasons. Because the tourniquet had a dangerous propensity to build undetected pressure, the expert said that monthly inspections were too infrequent, and the user should have been warned that the tourniquet should be tested and examined before each use. The owner's manual also failed to tell users how often to replace the pressure regu-

lating valve and failed further to advise that the valve could fail at any time. More generally, the expert said that the manual did not describe the inherent limitations, as he described them, in the design of the pressure regulating system. Finally, he testified that the admonition to monitor the cuff pressure continuously was ineffective because in his experience (which was as a biomedical engineer) anesthesiologists do not monitor the tourniquet during surgery, but rather simply rely on the tourniquet to maintain a constant pressure. In this connection, he also said that the manual's warning about constant monitoring was undercut by its affirmation that once a desired pressure was selected, the tourniquet would maintain that pressure.

■ Under Massachusetts law, a manufacturer has a duty to warn about dangers in a product that are known or ought to be known to the manufacturer at the time the product is sold but that would not be apparent to the user. *Knowlton v. Deseret Medical, Inc.*, 930 F.2d 116, 120 (1st Cir.1991). *See Restatement (Second) of Torts* § 402A (1965). *See also Vassallo v. Baxter Healthcare Corp.*, 428 Mass. 1, 696 N.E.2d 909 (1998). The users here, of course, were not unsophisticated consumers, but highly trained and experienced medical professionals. The need for—and the content of—warnings has to be understood in that context. It may be inferred that the warnings given were in fact heeded by the tourniquet's users. *Knowlton*, 930 F.2d at 123; *Harlow v. Chin*, 405 Mass. 697, 545 N.E.2d 602, 606 (1989).

The unavoidable flaw in the plaintiff's case with regard to the failure to warn theory is the absence of any basis for concluding that a failure to give any of the proposed additional warnings was a cause of her harm. In other words, the plaintiff did not offer evidence that would have justified the jury in concluding that if the warnings had been given and heeded, the outcome would have been different.

The warnings that the plaintiff's expert said should have been given may be classified into three categories. Some related to the design of the tourniquet and the dangers inherent in the design. For example, he said

that the user should be warned that the tourniquet was susceptible to malfunction at any time because of the way the pressure regulator was designed. Some related to the maintenance of the tourniquet. For example, he said that the user should be warned that the tourniquet should be checked before each use and should be advised to change the pressure regulator valve often to forestall its failure. Some of the proposed warnings related to use. In particular, he criticized the warning to monitor the tourniquet pressure constantly during use, contending that whatever force this had was diminished by the assurance that the tourniquet would maintain the desired pressure once it had been set.

The jury was not persuaded that there was a design defect, so it is not likely that they thought an additional warning about the basic design should have been given. Even if they had (inconsistently) thought so, however, there was no basis in the evidence for them to conclude that an additional statement about the alleged design flaw—broadly put, that the tourniquet could malfunction at any time without warning—would have added materially to the caution that was, in fact, unambiguously given: IMPORTANT! MONITOR CUFF PRESSURE CONTINUOUSLY DURING USE. At most, the additional information recommended by the expert would have indicated a reason why it was important to monitor the pressure during use. But it did not add a caution that had not already substantially been given. In other words, there is not a substantial difference between a warning that says, "Important! Monitor Cuff Pressure Continuously during Use" and a warning that says "Important! Monitor Cuff Pressure Continuously during Use Because the Tourniquet May Malfunction Unexpectedly." There was no basis in the evidence for any jury to find a

substantial difference between those two warnings, let alone the particular jury that itself did not find, though urged to do so, that a design defect had created the possibility that the tourniquet would malfunction as alleged.

Likewise, the proposed warnings about proper maintenance of the tourniquet would not have made a difference because the evidence did not indicate that maintenance was a factor in the event at issue. By the time this suit was brought, the actual tourniquet used in the plaintiff's surgery had been disposed of. The only evidence concerning the actual condition of the tourniquet was that it apparently passed an inspection for calibration and stability after the plaintiff's surgery. There was no evidence that poor maintenance—such as a failure to change the pressure regulator valve in a timely fashion—contributed to any malfunction during the surgery. Nor was there evidence to support a conclusion that an inspection of the tourniquet before the surgery would have disclosed an impending failure. Rather, the plaintiff's theory was that the malfunction occurred as a result of the concurrence of a temporary leak in the valve, a simultaneous temporary blockage of the exhaust port, and the failure of the pressure gauge to give notice of the dangerously increased pressure.[1] This failure would not have been prevented by the warnings concerning proper maintenance proposed by the plaintiff's expert.

■ These considerations compel a conclusion that the verdict that a failure to warn was a cause of the plaintiff's injuries cannot be supported on the evidence at trial, and the defendant is entitled to have a judgment in its favor on that theory entered as a matter of law.

---

1. There were two problems with the part of the theory that explained why the pressure increase went undetected. If the increase in pressure was shown on the pressure gauge, as it would be when the gauge was working properly, it would have been seen by those whose function included monitoring the gauge. The application of the tourniquet was part of the anesthesiologist's responsibilities, and the parties stipulated that the anesthesiologist "did not make an anesthesia mistake or error in the course of the surgery."

Stipulations of the Parties ¶ (d) (Docket No. 54). It would have been a mistake, presumably, not to monitor the pressure gauge.

On the other hand, the pressure gauge might not have been working properly, so that it might not have accurately shown the pressure increase posited by the plaintiff. There was no evidence that it was not working, however, and the gauge apparently passed its post-surgery testing, indicating that the gauge was not out of calibration.

Alternatively, if the foregoing conclusion is erroneous, the defendant ought to have a new trial. Even if a verdict favorable to the plaintiff on the failure to warn theory can be sustained, it would nevertheless be hard to reconcile with the jury's answers to the questions concerning the design defect theory. The major thrust of the plaintiff's effort was to convince the jury that the tourniquet was defectively designed, giving it the dangerous propensity to malfunction that the plaintiff says was actuated in her case. The jury was unpersuaded. It cannot be that the defendant had a duty to warn about a propensity that did not exist. On the evidence at trial, the conclusions that there was no design defect and that there was a failure to warn are troublingly inconsistent, if not actually contradictory. It is possible that the jury misunderstood the instructions concerning these theories, or perhaps that the different answers were the product some kind of compromise. We cannot know at this stage. But the conflict in the answers is substantial enough that there should be a new trial on these issues in the interest of justice.

Finally, as an additional reason for a new trial, the jury's conclusion that the defendant had given inadequate warnings was against the weight of the evidence. The owner's manual for the tourniquet contained a number of warning statements, including the following:

On the front page:

To Operating Room Supervisor: KEEP THIS MANUAL ON PERMANENT FILE WITH THIS INSTRUMENT

.   .   .   .   .

IMPORTANT! THIS INSTRUMENT IS TO BE OPERATED BY QUALIFIED PERSONNEL ONLY IN ACCORDANCE WITH THE INSTRUCTIONS IN THIS MANUAL.

On page 2:
NOTE: THIS INSTRUMENT MUST BE TESTED MONTHLY IN ACCORDANCE WITH INSTRUCTIONS IN THIS MANUAL.

On page 4:
IMPORTANT! IMPROPER USE COULD CAUSE PARALYSIS AND NERVE DAMAGE. CUFF LOCATION, PRESSURE AND DURATION OF APPLICATION MUST BE ESTABLISHED OR APPROVED BY THE RESPONSIBLE SURGEON IN CHARGE. CUFF PRESSURE MUST ALSO BE MONITORED CONTINUOUSLY DURING USE.

On page 5:

NOTE: IF INSTRUMENT HAS NOT BEEN IN REGULAR USE, THE INSPECTION AND ACCEPTANCE TEST PROCEDURE DETAILED IN THIS MANUAL SHOULD BE FOLLOWED IN FULL BEFORE USE IN SURGERY.

On page 6:

**TO USE TOURNIQUET DURING SURGERY**

.   .   .   .   .

IMPORTANT! MONITOR CUFF PRESSURE CONTINUOUSLY DURING USE.

Pressure will remain at the selected setting during the entire procedure unless manually changed. Always set instrument to desired pressure by adjusting *upward* to the specified setting as instructed above. If it becomes necessary to reduce pressure to a lower setting, turn pressure control knob (**B**) counterclockwise until the pressure gauge (**H**) reaches *50 mm Hg. below* the desired setting and then increase the pressure by slowly turning the control knob (**B**) clockwise until the specified pressure is reached. This procedure assures accurate compensation for pressure loss that might occur due to extrusion of limb tissue or small leaks in cuff system.

NOTE: SHOULD A LEAK EVER DEVELOP IN THE TOURNIQUET VALVE DURING USE, THE SET PRESSURE WILL RISE AT LEAST 150 MM HG. BEFORE PRESSURE RELIEF OPERATES.

INSTRUCTIONS IN THIS MANUAL FOR MAINTENANCE MUST BE FOLLOWED TO MINIMIZE LEAK POTENTIALS.

.   .   .   .   .

## MAINTENANCE

This instrument must be kept in a leak-free condition and tested periodically to verify that there are no leaks. Leaks in the cuff, hose, or tourniquet can develop from wear, foreign matter or damage.

**ON A REGULAR MONTHLY BASIS:**

● Inspect all components for damage.

● Check that they are clean and free from foreign matter.

● Test as noted in *Inspection and Acceptance Procedures* section of this manual.

● Enter date and test results.

On page 7:

## MINOR REPAIRS

Two important parts in the tourniquet which are the most subject to wear may be replaced by qualified hospital personnel when necessary. . . .

**Check valve assembly** . . . Replacement of this part is necessary when persistent leakage occurs at this part. . . .

.     .     .     .     .

**Regulator valve assembly** . . . This part must be replaced if the indicator needle on the pressure gauge (**H**) does not remain stationary on the set pressure or if the Medic Air® gas reservoir (**G**) empties entirely overnight. . . . Test the tourniquet as instructed in this manual's INSPECTION AND TEST PROCEDURES section.

In light of these warnings, addressed to a learned audience, the jury's answers that the defendant was negligent, and breached its implied warranty, in failing to warn of dangers not apparent to the user can fairly be said to be against the weight of the evidence, warranting a new trial if the entry of judgment in favor of the defendant should be considered error.

*Express Warranty*

Under Massachusetts law, an express warranty may include "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain. . . ." Mass.Gen.L. ch. 106, § 2–313(1)(a). The plaintiff's claim that the defendant breached an express warranty about the tourniquet relies on a single statement in the operating manual. As quoted above, under the general heading **"TO USE TOURNIQUET DURING SURGERY,"** as shown on page 6 of the manual, the following sentence appears: "Pressure will remain at the selected setting during the entire procedure unless manually changed." This statement is, the plaintiff says, an "affirmation of fact or promise" about the tourniquet that amounted to an express warranty that the tourniquet will not malfunction as the plaintiff claims it did.

Read alone, the statement certainly can be understood as an affirmation of fact or promise about the tourniquet. The text surrounding the statement, however, so qualifies and limits the generality of the statement that it cannot be fairly understood, by the learned audience to whom it was addressed, as a promise that the pressure would never vary. Immediately before the statement relied on, in much more prominent typeface, the manual warns the user to "Monitor Cuff Pressure Continuously During Use." [2] The manual also prominently asks the user to note that the pressure in the tourniquet may rise "at least 150 mm Hg. before pressure relief operates." It makes reference to the possibility of leaks, and recommends maintenance to prevent or detect them.

The statement that the tourniquet will maintain the pressure initially set, read in this context, simply does not bear the unqualified meaning that the plaintiff seeks to attribute to it. If the relevant portion of the manual is read together sensibly, it is apparent that the meaning intended to be conveyed is that the tourniquet will ordinarily maintain the pressure set by the operator throughout the procedure, but that it still is necessary to monitor the pressure continuously because there is some danger of pressure increases, from leaks or otherwise, and the pressure may rise as much as 150 mm Hg. before the tourniquet will self-correct

---

**2.** This is the second time the same warning appears in the manual. The warning is given first in connection with a statement that "improper use [of the tourniquet] could cause paralysis and nerve damage." Owner's Manual, at 4.

(this last point underscoring the stated need for continuous monitoring).

The upshot is that, as a matter of law, a reasonable fact finder could not conclude on these facts that the statement relied on created an enforceable express warranty. Consequently, the defendant is entitled to judgment in its favor as a matter of law on the express warranty claim. Alternatively, if that conclusion should be in error, the verdict for the plaintiff on that claim is against the weight of the evidence, and the defendant is entitled to a new trial.

*Conclusion*

For the foregoing reasons, the judgment previously entered shall be vacated, and a new judgment shall enter in favor of the defendant under all counts of the complaint.

IT IS SO ORDERED.