Kottmyer, J.
Plaintiffs, Maureen Chamian (hereafter “Chamian”) and Arthur Chamian, brought this action against defendants Sheldon Sevinor, M.D. (“Sevinor”), Sharplan Lasers, Inc. (“Sharplan”) and CounterPulsation, Inc. (“CounterPulsation”). Chamian alleges that she suffered severe facial scarring and skin discoloration after Sevinor performed cosmetic surgery on her using a laser manufactured by Sharplan. CounterPulsation owned the laser and pro *363 vided a technician who assisted in the surgeiy. Plaintiffs assert claims for negligence, breach of warranty and loss of consortium.
Sharplan and CounterPulsation filed motions for summary judgment on the grounds, inter alia, that plaintiffs had not adduced expert testimony establishing the requisite causal relationship between their alleged conduct and the injuries suffered by Chamian. A hearing was held on August 28, 2003. The Court permitted plaintiffs to submit a supplemental affidavit of their expert witness, David J. Goldberg.’M.D. (“Goldberg”), and gave leave to Sharplan and CounterPulsation to depose Goldberg. Thereafter, the parties submitted additions to the summary judgment record in a supplemental memoranda. For the following reasons Sharplan’s motion for summary judgment is allowed and CounterPulsation’s motion for summary judgment is allowed in part and denied in part.
SUMMARY JUDGMENT RECORD
The summary judgment record, viewed in the light most favorable to the plaintiffs, contains the following facts. On January 20, 1998, Sevinor performed cosmetic surgery on Chamian, who at the time of the surgeiy was fifty-nine years old. The surgeiy consisted of a face lift, blepharoplasty (eye lift), and “laser resurfacing” of Chamian’s chin, upper lip and forehead. After the surgeiy, Chamian experienced significant facial scarring and loss of pigmentation.
Sevinor is a specialist in plastic and reconstructive surgeiy and has been in practice since 1977. About ninety percent of his practice consists of cosmetic surgery involving face lifts, eye lifts, chemical peels and aesthetic treatment involving “laser resurfacing.” Laser resurfacing involves the use of laser energy to create a controlled bum that vaporizes the epidermis, or outer layer of a person’s skin, to promote the regrowth of skin that appears smoother and tighter with fewer wrinkles and facial lines.
While use of laser equipment for cosmetic surgeiy has been regarded as a safer and more effective technique than dermabrasion, which involves freezing and scraping of the epidermis, or chemical peels, it has great potential for harm if used improperly. Because cosmetic surgery using laser beams involves a controlled burning of the epidermis, misuse of the laser equipment can result in excessive burns, hypotropic scarring (raised skin scars), hypopigmentation (loss of skin color), infections, abnormal skin tightness and other conditions. Even proper use of the laser equipment may result in complications if the subject’s skin does not react normally to the treatment. Sevinor explained these risks to Chamian and, before the surgery was performed, Chamian signed a “Carbon Dioxide Laser Surgeiy Informed Consent Form” that detailed these potential complications.
Sharplan is a manufacturer and seller of surgical instruments that utilize laser light. CounterPulsation is engaged in the business of renting high technology surgical equipment, including laser equipment, to doctors and hospitals for use in medical procedures. The hospital at which Chamian’s surgeiy was performed rented the equipment used in her surgeiy from CounterPulsation. Sharplan manufactured the equipment used in the surgery.
Before operating on Chamian, Sevinor had attended numerous professional courses, training sessions and workshops on laser resurfacing and had undergone a preceptorship with a surgeon experienced in the use of laser equipment in resurfacing procedures. Sevinor had also received training from Sharplan and from other manufacturers of laser equipment. He had read medical literature on the subject of using laser equipment for skin resurfacing. In that literature, the authors discussed the results achieved during resurfacing procedures and the equipment and settings used during those surgeries. Before Chamian’s surgeiy, Sevinor had performed approximately thirty facial cosmetic surgeries using laser equipment.
Sevinor used a Sharplan Model 40C surgical laser equipped with a SilkTouch Scanner accessoiy to perform Chamian’s surgeiy. The Model 40C is a registered medical device that can only be used to perform surgery by licensed physicians. The Model 40C is a carbon dioxide laser which uses light to remove human tissue by creating a controlled bum. When the laser is activated, a red circle or aiming beam shows the physician where the invisible C02 laser energy is being directed. The Model 40C can be used for a variety of surgical procedures depending on which accessoiy is used. It is a complex machine requiring adjustment of multiple variable controls and settings.
The SilkTouch Scanner is an accessoiy used with the Model 40G for freehand surgical applications. It delivers a focused laser beam with constant velocity in a spiral pattern. The SilkTouch set includes four focusing handpieces. Two are used for skin resurfacing, the 125 mm, which provides scan sizes up to 3.7 mm, and the 200 mm, which provides scan surfaces up to 9.0 mm for quick resurfacing of large areas. The scanner moves a “spot” of laser through a predetermined pattern. In a circular pattern, the scanner causes the beam to trace the circumference of a circle and then spirals to the center of the circle. The scan time must be long enough to permit the beam to fill in a circle of the size selected by the surgeon. Using a 200 mm handpiece, it takes .45 of a second for a scanner to draw and fill in a circle. Thus a scan time or on-time of .45 is entered so that when the foot pedal is depressed for that length of time, the beam stays on for .45 seconds. The beam then shuts off until tire pedal is again depressed even if the physician has not released the pressure on the foot pedal.
The operating surgeon selects the handpiece to be used on a particular area of skin depending on the size *364 of the area to be treated. He is required to use clinical judgment to determine the appropriate settings in light of the characteristics of the patient’s skin and the objectives of the surgery.
The particular laser equipment used by Sevinor on Chamian was placed in rental service in January 1996. It had been used on eighty-three occasions before Chamian’s surgery, and has been used at least fifty-one times since, without any reported malfunctions. When CounterPulsation rents the machines for use, it provides a technician to test the equipment to ensure that it is working properly and to assist the physician by entering and adjusting settings as directed by the physician.[1] The technician also makes a record of the surgery detailing the areas treated with the laser and the equipment and settings used during the surgery. There is no requirement that laser technicians be licensed. There is no certification program and no approved course of study for laser technicians.
CounterPulsation employed Sandra Raymond (“Raymond”) as a technician and assigned her to assist Sevinor during Chamian’s surgery. Raymond is a registered X-Ray technician and had been a licensed practical nurse. Raymond had received training in laser equipment from CounterPulsation and from Wayne Robinson, a Sales Manager for Sharplan, who had sold the equipment used in the surgery to CounterPulsation’s predecessor. Raymond had participated as technician in approximately forty laser resurfacing procedures before January of 1998. She had assisted Sevinor on approximately twelve occasions and had used Sharplan equipment on each of those occasions.
Before each surgery, the operating surgeon and technician test the equipment to ensure that it is operating properly. In addition, the surgeon determines and the technician enters settings that control the operation of the equipment during the procedure. As stated above, the handpiece used (125 or 200mm) and the settings entered control the size, power and duration of the beam. The laser operation modes control the power pattern and the peak power outputs. There are three operation mode keys used with the SilkTouch Scanner, Continuous Wave (CW), Single Pulse and Repeat Pulse. There are three tissue exposure modes (“TEMs”) on the SilkTouch Scanner: single, repeat and continuous. In single TEM, the surgeon draws out a laser beam to a single spot with each push of the foot pedal. The beam stays on for an ON-time or “scan time” that has been determined by the physician and entered by the technician. To reactivate the beam, the physician must depress the foot pedal. In repeat TEM, the surgeon draws out a laser beam by pressing the foot pedal, the duration of the beam is again determined by the ON-time or scan time that has been entered, the beam then automatically retracts for a predetermined OFF-time that has been entered, and the sequence then repeats in accordance with the on- and off-times that have been entered. Generally, “single” mode is appropriate for use in small areas and by less experienced surgeons who have yet to develop a sufficient rhythmic technique to use “repeat” mode.
In “continuous” TEM, laser power continues while the foot pedal is depressed with no OFF-time. The continuous mode requires heightened attention by the surgeon because the beam is constantly on, meaning that neither ON-time nor OFF-time has been entered.
Appendix B to the Model 40C User’s Manual entitled “Professional Information” states that physicians and other professionals, identified as “dentists, veterinarians, podiatrists, etc.,” should review published literature in the specific surgical specially of interest concerning C02 laser applications and that “[a] thorough understanding of laser tissue interactions and treatment techniques and options should [be] gained.” The Manual states that before using the Sharplan C02 laser, a physician or professional “must fully understand the surgical effect produced by the laser at the 10.6 micron waveling when using the intended accessoiy.” It continues:
the laser system should be used only by physicians and staff who have been appropriately trained and who are thoroughly familiar with the instructions, cautions and warnings in the User Manual.

The information provided in this section is not intended to be all inclusive and is not intended to replace physician or professional training or experience.

In a section entitled General Surgical Characteristics, the Manual notes that thermal damage to surrounding tissue is usually reduced with shorter laser activation durations, whereby less heat is lost to surrounding healthy tissue.
Appendix C to the Model 40C User’s Manual “is provided to aid professionals in the use of the SHARPLAN C02 laser system in specific surgical specialities.” Section C.4, which is one page in length, provides information for use of the equipment in “Dermatology/Plastic Surgery.” It states that the laser equipment should only be used in conditions where its use is appropriate and of proven efficacy, “as reported in the clinical literature.” Under the heading “Specific Precautions and Recommendations,” Section C.4.3 of the Manual states:
For superficial ablation of tissue, pulsed modes of operation . . . may be used to limit depth of thermal injury or char. Select appropriate power levels and spot size. Lower power densities may cause excessive thermal injury to underlying tissue through conducted heat. High power densities may result in excessive tissue vaporization. Begin with lower to moderate powers and short application times until clinical effect can be judged. (Emphasis added.)
Section 5 of the User’s Manual for the SilkTouch Scanner describes the modes used in various proce *365 dures, including skin resurfacing. The Manual states that the skin resurfacing procedure is performed in the continuous wave (CW) laser operation mode using either the 125 or 200mm handpiece. The Manual continues that resurfacing “can be performed in two different exposure modes,” identified as Single Pulse and Repeat Pulse.[2] Each of the two TEMs requires entiy of a scan time or on-time. The Manual specifies that “ON-time on the laser unit should be set equal to the scan time set forth in Table 3.” Table 3 specifies the scan time for each handpiece depending on shape (round or square) and beam size. The operating instructions for the SilkTouch User’s Manual direct the user who has selected the repeat mode to select scan or on-times from Table 3 and state that recommended off-times are listed in Table 2. Table 2 is entitled “Start-Safe Silk Touch Parameters for Resurfacing.” It sets forth parameters for scan time, off-time and power for use with the 125 and 200 mm handpieces depending on scan shape and size. The start-safe parameters for the 125 mm handpiece for a 3.7 scan size show a scan time of 0.2, and off-time of 0.4 and a power range of 5 to 7 watts. The start-safe parameters for the 200 mm handpiece show a scan time of 0.45, an off-time of 0.4 and a power range of 16 to 18 watts.
Robinson trains technicians and physicians to use the “Start-Safe Parameters” recommended by Sharplan when preparing the machine for surgery. Robinson trains technicians to recommend the Start-Safe Parameters if asked by a surgeon to make a recommendation. While a surgeon may seek recommendations from the technician, it is the surgeon’s responsibility to determine the appropriate settings and to confirm that the technician has entered those settings as directed.
Both Sevinor and Raymond had read the Sharplan User’s Manual before using the equipment. Before Chamian’s surgery, Raymond and Sevinor tested the Sharplan 40C and also tested the shape and consistency of the laser beam by focusing the beam on wooden tongue depressors, so that they could gauge the intensiiy and accuracy of the beam. Neither Raymond nor Sevinor observed anything unusual about the operation of the machine before or during the surgery on Chamian.
Sevinor told Raymond that he would resurface Chamian’s forehead, chin and upper lip and asked her to recommend appropriate settings. Sevinor followed Raymond’s recommendations. Raymond set the unit in continuous TEM, an exposure mode that is not recommended for skin resurfacing.[3] Raymond had used continuous TEM on each occasion that she had assisted in surgery using the SilkTouch Scanner, including the previous occasions when she had assisted Sevinor. Because she used continuous TEM, Raymond did not enter an ON-time. Sevinor believed that an ON-time was automatically programmed into the laser. Raymond recommended that Sevinor use “conservative power levels,” that he “go low.” She entered power levels that were lower than the “Start-Safe Parameters” for power levels set forth in Table 2. During the surgery, neither Sevinor nor Raymond noticed anything abnormal about Chamian’s reaction to application of the laser beam.
The Laser Resurfacing Patient Record of Chamian’s surgery was filled in by Raymond. The word “pulse” with a line appears on the form in several places, but is either crossed-out or left blank. The record states that the 200 mm handpiece was used on Chamian’s forehead with a 9 mm spot size and a 12-watt power, and that the 125 mm handpiece with a 6 mm spot size[4] and 8-watt power setting were used on the lip and chin. The record does not list any scan times or off-times.
Chamian’s post-surgery healing was unsatisfactory. She encountered slow regrowth of skin in the treated areas on her face, loss of pigmentation and hypertropic scars. Her injuries are consistent with bum injuries. Plaintiffs’ expert opined that Chamian’s injuries likely resulted from the use of continuous TEM and a low power range.
APPLICABLE LAW Summary Judgment Standard
A court should grant summary judgment where the record, including pleadings, depositions, answers to interrogatories, admissions on file and affidavits, shows that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community National Bank v. Dawes, 369 Mass. 550, 553 (1976). Courts must construe facts in the light most favorable to the non-moving party. Harrison v. NetCentric Corp., 433 Mass. 465, 468 (2001); Ford Motor Co. v. Barrett, 403 Mass. 240, 242 (1988). The moving party has the burden of demonstrating the absence of a genuine issue as to any material fact and that it is entitled to have questions of law resolved in its favor. Mass.RCiv.P. 56(c); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711 (1991); Ford Motor Co. v. Barrett, 403 Mass. at 242. See also Flesner v. Technical Communications Corp., 410 Mass. 805, 808-09 (1991) (the moving party can satisfy its burden by demonstrating that the non-moving party has no reasonable expectation of proving an essential element of its case at trial).
DISCUSSION
Claims Predicated on Breach of Warranty and Negligent Failure to Warn
Chamian alleges that Sharplan negligently designed and manufactured the machine and failed to give adequate warnings. The record is devoid of evidence that Sharplan’s design and manufacture of the machine was defective, or that the machine malfunctioned during the surgery.[5]
*366 Negligent failure to warn and failure to warn under a breach of warranty are judged by the same standard, “the reasonableness of the defendant’s actions in the circumstances.” Hoffman v. Houghton Chemical Corp., 434 Mass. 624, 637 (2001). The reasonableness of a manufacturer’s actions must be determined in light of the “subject matter, the force and danger of the material under the defendants’ charge, ánd the circumstances of the case.” Zezuski v. Jenny Manuf. Co., 363 Mass. 324, 327 (1973). “The manufacturer can beheld liable even if the product does exactly what it is supposed to do, if it does not warn of the potential dangers inherent in a way a product is designed.” Laaperi v. Sears, Roebuck & Co., Inc., 787 F.2d 726, 729 (1st Cir. 1986) (applying Massachusetts law).
The defendants argue that, unlike the typical products liability case where the duty to warn flows from the manufacturer to the consumer, in cases involving a physician using a medical device, the duty to warn is owed to the physician as a learned intermediary. See Knowlton v. Deseret Medical, Inc., 930 F.2d 116, 120 n.2 (1st Cir. 1991) (applying Massachusetts law) (“It is generally accepted that in a case involving medical products prescribed or used by a physician or trained medical personnel, the warning runs to the physician not the patient”).[6] Proper warnings may shield a manufacturer from liability, where the manufacturer had a reasonable “justified reliance upon... a middleman.” MacDonald v. Ortho Pharmaceuticals Corp., 394 Mass. 131, 136 (1985).
Also relevant in the circumstances of this case is the “sophisticated user” defense which is an application of the established principle that a manufacturer or vendor may avoid liability “for failing to warn someone of a risk or hazard which he appreciated to the same extent as a warning would have provided.” Knowlton, 930 F.2d at 120, quoting Slate v. Bethlehem Steel Corp., 400 Mass. 378 (1987). See Colter v. Barber-Greene Co., 403 Mass. 50, 59 (1988) (where the danger presented by a given product is obvious, no duty to warn exists because a warning will not reduce the likelihood of injury). The “sophisticated user” defense applies “when the end user knows or reasonably should know of a product’s dangers” and permits a fact finder to determine that no duty to warn was owed because the danger presented by a given product was obvious to the user and a warning would not reduce the likelihood of injury. Hoffman v. Houghton Chemical Corporation, supra, 434 Mass. at 630. The sophisticated user defense requires no intermediating relationship; the relevant inquiry turns on the end user’s level of sophistication. Id. In contrast, under the learned intermediary doctrine, the duly to warn is satisfied by appropriate warnings to the intermediary.
The equipment in this case may be used for surgery on patients only by licensed physicians. Where, as here, the users of equipment are not unsophisticated consumers, but highly trained and experienced medical professionals, “the need for — and the content of — warnings has to be understood in that context.” Jones v. Walter Kidde Portable Equipment, Inc., 16 F.Sup.2d 123, 125 (D.Mass. 1998), affd, 183 F.3d 67 (1st Cir. 1999).
Plaintiffs argue that the warnings were inadequate because Sharplan provided Start-Safe parameters and then “watered them down” by stating the final decision as to the settings to be used was the physician’s. It is undisputed, however, that it was the physician’s responsibility to exercise his clinical judgment to determine the appropriate settings based on the characteristics of the patient’s skin and the objectives of the surgeiy. The User’s Manual for the SilkTouch Scanner states that skin resurfacing is to be performed in single or repeat TEM and directs the user to enter a scan time determined with reference to the handpiece used and the size and shape of the spot to be filled in by the beam. Plaintiffs’ expert has opined that the cause of Chamian’s injuries was the failure to enter a scan or on-time, the effect of which was that the beam stayed on as long as the foot pedal was depressed. He describes the use of continuous TEM in the resurfacing procedure as “a gross deviation from the standard of care.” The Plaintiffs also argue that defendants did not warn of the risk of using lower power levels. That risk is expressly covered in Appendix C of the User’s Manual.
Both Sevinor and Raymond testified that they read the User’s Manual and each testified that he/she knew that variations in power level and length of exposure of the laser to the patient’s skin could result in burning and scarring. The plaintiffs’ failure to warn claim fails because they have not identified a warning that should have been given, but was not, and they have adduced no evidence that if an additional warning had been given, it would have been heeded and a different result would have obtained. See Colter v. Barber Greene Co., supra, 403 Mass. at 59; Jones v. Walter Kidde Portable Equipment, Inc., supra, 16 F.Sup.2d at 125.
Claims Predicated on Negligent Training
Sharplan’s Sales Manager Wayne Robinson provided training to Raymond. In addition, Sevinor received training from manufacturers’ representatives, including Sharplan, at various conferences and workshops. A jury could find that neither Sevinor nor Raymond had an adequate understanding of the operation of the Silk Touch Scanner and the Start-Safe Parameters. Raymond testified that she used the continuous TEM and never used the on- and off-settings when assisting at surgeries performed with Sharplan equipment. Sevinor believed that off-times were programmed into the laser. Sevinor adopted Raymond’s suggestion that he use power levels that were lower than those specified in the Start-Safe Parameters which Raymond incorrectly believed was a “conservative” approach. But the fact that individuals who have received training on medical equipment subsequently *367 misuse the equipment to the detriment of a patient, standing alone, is insufficient to establish a breach of a duty to the injured patient on the part of the entity that provided the training. By providing training, Sharplan did not become a guarantor of the competence of either Sevinor or Raymond.[7] It did not certify their competency.
In contrast to Sharplan, CounterPulsation provided a technician to assist in the surgery, and, by doing so, assumed a duty to Chamian to ensure that the technician, Raymond, was knowledgeable about the equipment and competent to provide technical assistance to physicians using the equipment. Moreover, as Raymond’s employer, CounterPulsation is vicariously liable for negligence on her part. The fact that Sevinor had the responsibility to exercise his clinical judgment to determine appropriate settings and was required by the standard of care to confirm that the settings he selected had been entered does not preclude negligence on the part of Raymond from being a substantial contributing cause of Chamian’s injuries. Even if, notwithstanding statements to that effect in the User’s Manual, Raymond could not be expected to know that use of low power levels posed a risk of thermal injuiy, a jury could find that Raymond’s recommendation of continuous TEM and other settings that deviated from the Safe-Start Parameters was negligent. Regardless whether there is a “standard of care” applicable to technicians, CounterPulsation had a duty to provide a trained and competent technician and, in any event, is vicariously liable for any failure by Raymond to use reasonable care in the performance of her duties as a technician assisting in the surgeiy.
ORDER
For the foregoing reasons, Sharplan’s motion for summary judgment on all claims against it is ALLOWED. CounterPulsation’s motion for summary judgment is ALLOWED as to Count V and as to those portions of Counts IV and V that assert claims for negligent breach of warranty and negligent failure to warn and DENIED to the extent that Counts IV and V assert claims against CounterPulsation for negligence predicated on failure to provide a competent technician and for vicarious liability.[8]

The surgeon may only come in contact with those portions of the equipment that have been sterilized.

In contrast, a procedure called “painting” is performed in CW operation mode and continuous TEM.

 Defendants dispute that the laser was in continuous TEM during Chamian’s surgeiy. They argue that plaintiffs’ expert assumed that the laser was in continuous mode and that Sevinor’s description of the surgeiy and his observations of the effect of the laser on Chamian’s skin are inconsistent with the use of continuous TEM. Raymond testified that she used continuous TEM. Moreover, it is undisputed that she did not record the pulse- and/or on- off-times on Chamian’s record. Accordingly, for purposes of this motion, this disputed fact is viewed in the light most favorable to plaintiffs.

The maximum spot size using the 125mm handpiece is 3.7mm.

 To the contrary, the record evidence establishes that the machine used on Chamian has been used in over one hundred surgical procedures and has never malfunctioned or caused injuries similar to those suffered by Chamian. The machine received regular maintenance and testing before and after the surgeiy, neither of which resulted in discovery of any defects. Chamian did not test the machine.

 The rationale behind the “learned intermediary doctrine” is that medical procedures and prescription drug purchases differ from typical consumer transactions where a consumer purchases a product or service directly from the manufacturer or an authorized seller. In medical procedures, the consumer is “purchasing” the services of a physician and typically has no contact with, or knowledge of, the manufacturer of the machine used in the procedure. Thus, because the physician communicates directly with a patient, the manufacturer must warn the physician of the dangers associated with the product and then rely on the physician’s expertise in conveying relevant warning information to the consumer/patient.

There is no evidence that Sharplan provided misinformation in any training session.

Count VI asserts a claim for loss of consortium.